**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**


OSTEOPATHIC FOUNDERS FOUNDATION, )
                                                )
                  Plaintiff, )
                                                )
vs.                                               )         Case No. 06-CV-426-GKF-FHM
                                                 )
KATHLEEN SEBELIUS, in her official )
capacity as Secretary of the United States )
Department of Health and Human Services, )
                                                )
                Defendant. )

## OPINION AND ORDER

        This is an appeal by plaintiff Osteopathic Founders Foundation ("OFF") of a final

decision of the Department of Health and Human Services' ("HHS") Provider Reimbursement

Review Board ("PRRB").[1]  At issue is the valuation of hospital assets for purposes of

reimbursement under the Medicare statute, 42 U.S.C. §1395 *et seq.*  For the reasons set forth

below, the PRRB decision is reversed and remanded.

### I.  Statutory and Regulatory Framework

        The Medicare Program provides health insurance to the aged and disabled.  42 U.S.C.

§1395-1395cc.  The Centers for Medicare & Medicaid Services ("CMS"), formerly the Health

Care Financing Administration ("HCFA"), is the operating component of HHS which is charged

with the administration of the Medicare Program.  CMS's payment and audit functions under

Medicare are contracted to insurance companies known as fiscal intermediaries.  Fiscal

---

[1]Pursuant to Fed.R.Civ.P. 25(d), Kathleen Sebelius, the current Secretary of HHS,  has
been automatically substituted in the place of former Secretary Michael O. Levitt as defendant in
this case.

intermediaries determine payment amounts due providers under Medicare law and interpretive guidelines published by the CMS.  *See* 42 U.S.C. §1395h; 42 C.F.R. §§413.134(f)(2)(iv)(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those to be allocated for Medicare reimbursement.  42 C.F.R. §413.20.  The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due to the provider, and issues a Notice of Program Reimbursement ("NPR").  42 C.F.R. §405.1803.  A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the PRRB within 180 days of the NPR.  42 U.S.C. §1395oo(a); 42 C.F.R. §413.134.  An asset's depreciable value is initially set at its historical cost, generally equal to its purchase price.  42 C.F.R. §413.134(f)(2)(b)(1).  The historical cost is not in dispute in this case.  To determine annual depreciation, the historical cost is prorated over the asset's estimated useful life in accordance with an acceptable depreciation method.  42 C.F.R. §413.134(a)(3).

If an asset is ultimately sold by the provider for less than the depreciated basis calculated under Medicare (equivalent to the "net book value" and equal to the historical cost minus the accumulated depreciation), then a loss has occurred since the sales price was less than the estimated remaining value.  In that event, the Secretary assumes that the asset had depreciated more than was originally estimated and, accordingly, provides additional reimbursement to the provider.  Conversely, if the asset is sold for more than its depreciated basis, then a "gain" has occurred and the Secretary recaptures the previously paid reimbursement.  42 C.F.R. §405.415(f)(1).

The issue in this case is the Secretary's determination of the meaning of "asset" in 42 C.F.R. §413.134(f)(2)(iv), which states:

> If a provider sells more than one asset for a lump sum, the gain or loss on the sale of each depreciable asset must be determined by allocating the lump sum sales price among all the assets sold, in accordance with the fair market value of each asset as it was used by the provider at the time of sale. If the buyer and seller cannot agree on an allocation of the sales price, or if they do agree but there is insufficient documentation of the current fair market value of each asset, the intermediary for the selling provider will require an appraisal by an independent appraisal expert to establish the fair market value of each asset and will make an allocation of the sales price in accordance with the appraisal.

This regulation is referred to as the "CMS Rule."[2]

## II.  Background/Procedural Status

OFF owned and operated the Tulsa Regional Medical Center from its inception until January 11, 1996, when it was sold to Notami Hospital of Oklahoma, a subsidiary of Columbia/Hospital Corporation of America, for a purchase price of $43 million.[3]  The net book value of the facility's depreciable assets was approximately $49 million.  As a result, OFF claimed a loss on sale for purposes of Medicare reimbursement pursuant to 42 U.S.C. §1395f(b)(1) and 42 C.F.R. §413.134(a)(2)(b)(1).  The intermediary, Blue Cross Blue Shield of Oklahoma, disallowed $943,089.00 in closing costs which OFF had deducted from the sale proceeds as costs incurred in selling the hospital, as well as an allocation of the sales proceeds for the appraised value of OFF's medical records ("MR") and assembled work force ("AWF").

---

[2]Providers seeking reimbursement under the CMS Rule prefer to apportion as much of the sales price as possible to nondepreciable assets, because this lowers the allocable sales price of the depreciable assets, maximizing both the provider's losses and its Medicare cost recovery. *See Lake Medical Center v. Thompson,* 243 F.3d 568, 345 (C.A.D.C. 2001).

[3]The $43 million purchase price included the acquisition of $16,846,816 in current assets (cash and accounts receivable), leaving a net purchase price of $25,403,184 to be allocated.

OFF appealed the intermediary's adjustments to the PRRB.  The PRRB reversed the intermediary's ruling on closing costs but affirmed its decision disallowing any allocation of sales proceeds for the appraised value of MR and AWF.  The Administrator for CMS declined to review the PRRB decision and, in accordance with 42 C.F.R. §405.1877, OFF filed this litigation.

In the proceeding before the PRRB, OFF contended, pursuant to 42 C.F.R. §413.134(f)(2)(iv),  that the partial allocation of sales proceeds to MR and AWF was appropriate and necessary since the parties agreed to such an allocation, and an appraisal had been performed to establish the allocation base. [Doc. No. 30, PRRB Decision, AR at 10].  The PRRB found, however, that MR and AWF are intangible assets that had going concern value and only exist in sales transactions where the sales proceeds exceed the value of the land and other tangible assets involved in the purchase. [*Id.,* AR at 13].  The PRRB concluded that the sales proceeds did not exceed the value of the tangible assets; therefore, MR and AWF were not found to exist. [*Id.*] The principal amount of funds in controversy as a result of the disallowance is $1,062,748. [*Id.,* AR at 8].

### III.  Standard of Review

Pursuant to 42 U.S.C. §1395oo(f)(1), the Secretary's final decisions on provider reimbursement under the Medicare Act are reviewed under the standards of the Administrative Procedures Act ("APA"), 5 U.S.C. §701 *et seq.*  Under the APA, a reviewing court may set aside an administrative decision if the decision is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.  5 U.S.C. §706(2)(A); *Via Christi Regional Medical Center, Inc. v. Leavitt,* 509 F.3d 1259, 1271 (10th Cir. 2007).  The APA "require[s] agencies, on

4

pain of being found to have acted arbitrarily and capriciously, to comply with their own regulations." *Via Christi* at 1271, citing *Cherokee Nation of Okla. v. Norton,* 389 F.3d 1074, 1078 (10th Cir. 2004).   Additionally, under the APA, an agency action will be set aside unless it is supported by "substantial evidence" in the administrative record.  5 U.S.C. §706(2)(E); *Via Christi,* 509 F.3d at 1271, citing *Pennaco Energy, Inc. v. U.S. Dept of the Interior,* 377 F.3d 1147, 1156 (10th Cir. 2004).  "Substantial evidence" is "something more than a mere scintilla but something less than the weight of the evidence." *Via Christi,* 509 F.3d at 1271.

## IV.  Material Facts

The January 11, 1996, Asset Purchase Agreement (the "Agreement") between Notami Hospitals of Oklahoma and OFF provided for the purchase of "all [hospital] assets...including...all current financial, patient, medical staff and personnel records assets" and "all other property, whether tangible or intangible, of every kind, character or description." [Doc. No. 30, Provider Ex. E, §1.1 at AR at 628-629].  The lump sum purchase price of $43 million was substantially less than the $49 million net book value of the facility's depreciable assets, and thus it is undisputed OFF incurred a loss on sale for purposes of Medicare reimbursement. [*Id.,* PRRB Decision, AR at 13].  The Agreement provided for allocation of the lump sum purchase price among specific assets, including "(iii) medical records" and "(iv)work force in place," in accordance with an appraisal to be conducted prior to closing by an appraiser selected by the buyer. [*Id.,* Provider Ex. E, §10.2(b), AR at 677].  Schedule 10.2 of the Agreement also provided preliminary figures for the allocation of the lump sum purchase price among the assets, with $1,901,000 allocated to medical records and $2,218,000 allocated to assembled work force. [*Id.,* Preliminary Purchase Price Allocation Schedule, AR at 693].  The

5

total allocation for tangible assets (Land, Land Improvements, Buildings, Leasehold Improvements and Major Moveable Equipment) was $20,636,000. [*Id.*]

After the closing, and pursuant to the Agreement, an appraisal of all assets was performed by Valuation Counselors ("VC"). [*Id.,* Provider Ex. G, AR at 695-824].  The effective date of the report was December 31, 1995. [*Id.,* AR at 695].  The intermediary and CMS deemed the VC appraisal as meeting applicable Medicare requirements. [*Id.,* Intermediary Ex. 19, Stipulation of Fact No. 12, AR at 1461].

The cover letter of the VC appraisal defined "fair market value" [Provider Ex. G, AR at 696],  but instead of stating  a "fair market value," concluded:

> Based upon our analysis, the *business enterprise value* of the Tulsa Regional
> Medical Center is reasonably represented by the following ranges:
>
> $25,500,000 To $32,250,000

[*Id.,* Provider Ex. G, AR at 696] (emphasis added).  The cover letter then listed the "allocated purchase price" of the assets sold.[4]  "Business enterprise value" was not defined [*Id.*], nor was a listing of valuation of assets comprising the supposed "business enterprise value" of $25,500,000-$32,250,000 provided. [*Id.*][5]

The "business enterprise value" supplied in the cover letter appeared nowhere in the VC

---

[4]The allocated purchase prices listed in the cover letter correspond with allocated purchase prices listed in the appraisal report itself. [*Id.,* AR at 774-775].

[5]At oral argument, neither party was able to adequately explain the meaning and significance of the term,"business enterprise value."  The appraisal itself did not provide a "business enterprise value."  It *does*, in a chart titled "Correlation of Values," list the valuations resulting from the three methodologies used. [*Id.,* AR, at 771].  The values from the income and market analyses correspond with the range of numbers identified as the "Business Enterprise Value" in the cover letter. [*Id.*]

appraisal itself.  The appraisal provided a definition of  "fair market value" identical to the definition in the cover letter [*Id.,* AR at 706-707].  It explained that  three methodologies are conventionally applied to establish the fair market value of a business enterprise--cost, market and income. [*Id.,* AR at 711-712].  The VC appraisal used each approach. [*Id.*] Applying the cost approach, VC determined the total replacement value of all assets to be $76,278,665. [*Id.,* AR at 755].[6]  The market approach yielded a total value of $32,250,000. [*Id.,* AR at 762].  The value of the assets using an income approach was determined to be $25,500,000. [*Id.,* AR at 770].

The VC appraisal concluded that since the purpose of the report was to determine the value of the underlying assets in accordance with 42 C.F.R. §413.134, the cost approach presented the best indication of asset values. [*Id.,* AR at 772].[7]  Accordingly, it found that the total asset value was best represented by the amount of $76,278,665. [*Id.*].  Of this total, medical records were valued at $6,500,000 and assembled work force at $8,900,000. [*Id.* AR at 773].  The total value of tangible assets (land, land improvements, buildings and equipment) was $60,878,665. [*Id.*, AR at 772-773].  Using as its basis the asset valuations obtained from the cost analysis, The VC appraisal allocated $2,164,704 of total net sales proceeds of $25,403,184  to medical records and $2,963,979 of net proceeds to assembled work force. [*Id.,* AR at 775].[8]  The

---

[6]The cost approach considers the value of the land, as determined through market analysis, plus the reproduction cost of the depreciable and certain intangible assets, less depreciation and amortization. [*Id.,* AR at 711].

[7]Indeed, the cost approach was the *only* one of the three methods that attempted to value the underlying assets.  The market and income approaches provided no such valuations.

[8]OFF has consistently asserted that the VC appraisal established fair market values of $2,164,704 and $2,963,979 respectively for medical records and assembled work force.  These figures, however, are actually amounts allocated from net sales proceeds to these two intangible assets based upon the valuations established in the VC cost approach analysis. [*Id.,* AR at 772-775].  Moreover, VC appraiser David Felsenthal did *not*–as OFF has asserted–testify that these

balance of net sales proceeds–$20,274,50l–was allocated to tangible assets. [*Id.*]   This

information can be summarized as follows:

| Asset | Cost Analysis Valuation | Allocated Purchase Price |
|---|---|---|
| Medical Records | $6,500,000 | $2,164,704 |
| Assembled Workforce | $8,900,000 | $2,963,979 |
| Tangible Assets | $60,878,665 | $20,274,501 |
| Total All Assets | $76,278,665 | $25,403,184 |

[*Id.*, AR at 774-775].

## V.  PRRB Decision

The PRRB, citing the VC appraisal, found that the fair market value of the assets was

roughly $76 million, which included $6.5 million attributable to medical records and $8.9

million attributable to assembled work force. [Doc. No. 30, PRRB Decision, AR at 13].  The

---

amounts were fair market value numbers.  Rather, he testified that these numbers represent the
value of medical records and assembled work force *after allocation* to the net sales proceeds.
[*Id.,* Felsenthal Depo., AR at 221].  In a similar vein, OFF incorrectly represented that the VC
appraisal had established the fair market value of tangible assets was $20,274,501.  This figure,
in fact, was the amount of net sale proceeds allocated to tangible assets based on the cost
approach valuation of $60,878,665. [VC Appraisal, AR at 775].  It appears OFF has confused the
fair market value of individual assets with the allocation of net sale proceeds to individual assets.
The CMS Rule explicitly states that "[t]he gain or loss on the sale of each depreciable asset must
be determined by allocating the lump sum sales price among all the assets sold, in accordance
with the fair market value of each asset as it was used by the provider at the time of sale."  42
C.F.R. §413.134(f)(2)(iv).   The fair market value is *not* the same as the allocated sales proceeds
number.  Rather, the fair market value is used as a *basis* for allocating sales proceeds among the
individual assets.  The VC Appraisal itself defines fair market value, in pertinent part, as "the
most probable price which a property should bring in a competitive and open market under all
conditions requisite to a fair sale." [*Id.,* AR at 706].  The allocated sales prices do not meet this
definition.

8

PRRB also concluded that the fair market value of the tangible assets exceeded the value of the facility's depreciable assets [*Id.*], and found that the sales price should not be allocated to medical records and assembled work force, stating:

> MR and AWF are intangible assets that have going concern value and only exist in sales transactions where the sales proceeds exceed the value of the land and other tangible assets involved in the purchase.

[*Id.*].  In support of this conclusion, the PRRB relied upon Paragraph 39 of FASB 141, which states that intangible assets that do not arise from contractual or other legal rights will be recognized as assets apart from goodwill only if they are capable of being separated from the acquired entity and sold. [*Id.,* AR at 14].  The PRRB found that MR and AWF–even if found to exist–could not be separated and sold apart from the provider's operation. [*Id.*].  The PRRB also noted Paragraph 39 of FASB 141 states that "an assembled workforce shall not be recognized as an intangible asset apart from goodwill," and it concluded that medical records share the same fundamental characteristics as assembled work force. [*Id.*]

As additional support for its decision, the PRRB cited the definition of "intangible value" published in A Dictionary for Accountants:

> [t]he value of an enterprise in its entirety, as a *going concern,* in excess of the value of its *net tangible assets.*
>
> Intangible value, arising from a monopoly, secret process, patents, trademarks, customer goodwill, managerial skill, growth of population, or numerous other possible causes, is often reckoned as the present worth of total earning power in excess of normal return on the value of net tangible assets.

[*Id.,* AR at 13-14].

OFF contends the PRRB decision was not supported by substantial evidence and was arbitrary and capricious.

## VI.  Analysis

OFF's challenge to the PRRB Decision focuses on two issues: first, whether the PRRB's findings regarding fair market value of the assets were supported by substantial evidence and second, whether the PRRB's interpretation of the term "asset" in the CMS Rule is arbitrary and capricious.

### A. Fair Market Value Determination

OFF asserts the PRRB decision disallowing allocation of sales proceeds to medical records and assembled work force was not supported by substantial evidence.  In particular, OFF contends the PRRB erred in concluding, based on the evidence before it, that the value of depreciable assets exceeded the sales price.   The court must determine whether the PRRB's findings regarding fair market value are supported by "something more than a mere scintilla but something less than the weight of the evidence."  *Via Christi,* 509 F.3d at 1271.

As noted in §4, n. 4 , *supra,* OFF asserts the PRRB's reliance on asset valuations of the cost analysis in the VC Appraisal was improper.  Instead, OFF argues the fair market values of the assets were the amounts the VC Appraisal allocated to assets from net sales proceeds; thus, the fair market value of the depreciable assets did not exceed net sale proceeds.

OFF's position is without merit.  As an initial matter, it is undisputed that the hospital assets were sold for $43 million, while  the net book value of the facility's depreciable assets was approximately $49 million.  The VC appraisal also supports a conclusion that the value of depreciable assets exceeded the sales price.  VC applied three common appraisal methodologies (cost, market and income) to determine the value of the assets.  The VC appraisal adopted the

10

cost approach to determine values in accordance with the CMS Rule because it was the only one of the three methods that resulted in valuations of the underlying assets.  The cost appraisal yielded total asset value of $76,278,665.  Medical records were valued at $6,500,000  and assembled work force at $8,900,000, leaving $60,878,665 in tangible assets.  None of the other valuations in the VC Appraisal–market, income or the unexplained  "business enterprise value" set out in the VC cover letter–provided a breakdown of values of the underlying assets.  Given that the cost valuation was the only approach that valued the individual assets,  PRRB's reliance upon it was entirely reasonable.  Its factual findings concerning fair market values of MR, AWF and tangible assets have ample support in the record.

### B.  PRRB's Interpretation of the CMS Rule

OFF contends the PRRB's refusal to allocate a portion of net sales proceeds to medical records and assembled workforce was arbitrary and capricious.  Thus, the court must inquire whether the Secretary's interpretation of 42 C.F.R. §413.134(f)(2)(iv) was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, or was not supported by substantial evidence.  *See Via Christi,* 509 F.3d at 1271.

In general, the court must give substantial deference to an agency's interpretation of its own regulations.  *Via Christi,* 509 F.3d at 1272, citing *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512 (1994).  However, there are limits to the bounds of judicial deference.  "[C]ourts must defer to an agency's interpretation unless an alternative reading is compelled by the plain language of the regulation or by other indications of the agency's intent at the time the regulation is promulgated."   *Aspenwood Investment Co. v. Martinez,* 355 F.3d 1256, 1261 (10th Cir. 2004).  "Where the plain language of a regulation is clear, we cannot torture the language to

reach the result the agency wishes." *Id.,* citing *Resolution Trust Corp. v. FSLIC,* 25 F.3d 1493, 1500 (10th Cir. 1994).

The CMS Rule states that "[i]f a provider sells more than one asset for a lump sum, the gain or loss on the sale of each depreciable asset *must* be determined by allocating the lump sum sales price among *all the assets sold,* in accordance with the fair market value of each asset as it was used by the provider at the time of the sale." 42 C.F.R. §413.134(f)(2)(iv). The regulation does not distinguish between tangible and intangible assets or depreciable and nondepreciable assets and it makes no reference to Paragraph 39 of FASB 141 or any "generally accepted accounting practices." Further, the CMS Rule states that if an independent appraisal is performed, the intermediary "*will* make an allocation of the sales price in accordance with the appraisal." *Id.* On its face, the regulation does not give the intermediary discretion to accept parts of the appraisal and reject other parts.

Moreover, the record supports a conclusion that, at the time the regulation was promulgated in 1979, the agency intended to allow the purchaser and seller to agree to an allocation of the sales price to individual assets without regard to the character of those assets. The Preamble to the final CMS Rule stated, in pertinent part:

> If several assets are sold for a lump sum, the amendments provide that the sales price will be allocated to each asset according to its fair market value for purposes of computing gain or loss. *The regulation encourages the buyer and seller to agree on an allocation of sales price*, but if the parties fail to agree, or if they agree but there is not sufficient documentation of current fair market value of each asset, the intermediary of the selling provider will determine the fair market value of each asset by an independent appraisal.
>
>         *        *        *
>
> The proposed regulation required that allocation of a lump sum sales price among the assets sold be based on an independent appraisal. Some commentators objected that this requirement would unnecessarily increase costs. *We have*

12

> *amended the provision to allow the seller and buyer to agree upon an allocation
> of a lump sum sales price, and we encourage them to do so.* If the parties do not
> agree on an allocation, or if they do agree but there is insufficient documentation
> of the current fair market value of each asset, the regulation provides that the
> intermediary of the selling provider will require an appraisal to establish the
> fair market value of each asset. *We believe that these changes in the regulation
> will avoid unnecessary costs, while assuring accurate allocations of lump sum
> sales prices.*

Preamble to final CMS Rule, 44 F.R. 3980 (January 19, 1979), 1979-1 Med-Guide TB ¶29,459,

[Ex. 30, Provider Ex. H, AR at pp. 827, 829] (emphasis added).

Section 104.14 of the Provider Reimbursement Manual (CMS Pub. 15-1) bolsters the

conclusion that, at the time of the regulation's promulgation, the agency did not distinguish

between tangible and intangible assets:

> The gain or loss on the sale of each depreciable asset must be determined by
> allocating the lump sum sale price among *all the assets sold (including land,
> goodwill, and any assets not related to patient care),* in accordance with the
> fair market value of each asset as it was used by the provider at the time of
> sale. If the buyer and seller cannot agree on an allocation of the sale price,
> or if they do agree but there is insufficient documentation of the current fair
> market value of each asset, the intermediary for the selling provider must
> require an appraisal by an independent appraisal expert to establish the fair
> market value of each asset *and must make an allocation of the sale price
> in accordance with the appraisal*....In any case the sale price *must be
> allocated among all the assets sold,* even when, for example, some of the
> assets will be disposed of shortly after the sale.

[Doc. No. 30, Provider Ex. N, AR at 865-866] (emphasis added).

Additionally, the Medicare Intermediary Manual (CMS Pub. 13-4) §4505 Appraisals,

provides:

> An appraisal is a comprehensive and systematic review of *all* assets–*both
> tangible and intangible*, real and personal–aimed at determining the values to
> be assigned to both depreciable and non-depreciable property.

[*Id.,* Provider Ex. I, AR at 832] (emphasis added).

PRRB decisions and case law involving sales of assets before October 1, 1991, support OFF's position that in a lump sum sale of assets, a portion of the sales proceed can be allocated to tangible assets. *See Care Plus, Inc. Group Appeal v. Aetna Life Insurance Company,* 1996-1 Med-Guide-TB ¶44,010 (January 29, 1996) [Doc. No. 30, Provider Ex. J, AR at p. 837-843] (sales agreement allocating net proceeds among depreciable and non-depreciable assets, including intangible assets, must be followed by the intermediary under the CMS Rule); *Creighton Omaha Regional Health Care Corporation v Sullivan,* 1990 WL 284513 (D. Neb. Dec. 14, 1990) [*Id.,* Provider Ex. K, AR at 845-852] (PRRB erred in determining there was inadequate evidence parties had assigned value to intangible assets of medical records and a certificate of need where sales agreement specifically listed such records as assets and an independent appraisal had assigned the assets a fair market value); *Sullivan Community Hospital v. Blue Cross and Blue Shield of Missouri,* 1994 Med-Guide TB ¶42,569, (June 27, 1994) [*Id.,* Provider Ex. L, AR at 854-858] (CMS Administrator reversed and remanded decision of the PRRB disallowing allocation of sales proceeds to intangible assets; Administrator held the CMS Rule required the intermediary to allocate sales proceeds to intangibles because parties to sale had agreed to the allocation and a full appraisal of all assets would provide sufficient documentation of the fair market value of the intangibles); *La Grange Colonial Manor v. Blue Cross and Blue Shield Association/Health Care Services Corporation,* 1987-2 Med-Guide TB ¶36,210 (January 15, 1987) [Provider Ex. M, AR at 860-864] (CMS Administrator reversed a decision of the PRRB because it failed to follow an independent appraisal that allocated a portion of the sales price to land and goodwill); *Vallejo General Hospital v. Bowen,* 851 F.2d 229, 232 (9th Cir. 1988) [*Id.,* Provider Ex. O, AR at 868-873] (court ruled parties' agreement on

14

allocation must be followed, commenting: "A bona fide sale bargained for at arm's length can be expected to produce allocations which accurately reflect the true economic value of the assets.").

The Secretary, however, asserts these cases are distinguishable because they all involve sales of assets for cost periods before October 1, 1991, the effective date of a statute which changed the law to permit Medicare reimbursement for capital costs. [Doc. No. 52, Defendant's Response to Plaintiff's Opening Brief. [Doc. No. 19, Intermediary Ex. 10, AR at 1064-1086].[9]

_____

[9]As the Secretary explains in her Response, before October 1, 1983, the Medicare statute, 42 U.S.C. §1395ww(g),  authorized reimbursement of the lower of a provider's "customary charges" or the "reasonable cost" of services furnished to the program beneficiaries.  42 U.S.C. §1395f(b)(1). [Doc. No. 52, Defendant's Response to Plaintiff's Opening Brief, p.9].  Effective for cost reporting periods beginning on or after October 1, 1983, Congress replaced this methodology of reimbursement for most hospitals' operating costs with a prospective payment system ("PPS").  42 U.S.C. §1395ww(d). [Id., pp. 9-10].  Under PPS, hospitals are reimbursed for their inpatient operating costs through payment of a fixed, prospectively determined amount that depends not on the hospital's costs of provided care, but on diagnosis of the patient on whose behalf the reimbursement is being made. [Id., p. 10].  When PPS was first enacted, capital-related costs such as those at issue here were excepted from payment.  Eventually, Congress amended that statute to require Medicare to reimburse hospitals for the capital costs of providing inpatient care based on a prospective system.  42 U.S.C.  §1395ww(g). [Id.].  This change was effective for cost reporting periods beginning on or after October 1, 1991.  42. U.S.C. §1395ww(g)(1).  The Secretary asserts that prior to the effective date, the buyer and seller had stronger competing interests in the allocation of the purchase price in a lump sum sale in the context of 42 C.F.R. §413.134(f)(2)(iv).  In *Vallejo General Hospital v. Bowen,* 851 F.2d 229, 232 (9th Cir. 1988), the court, quoting the Deputy Administrator, stated:

> The parties have opposite competing interests in the allocation, just as they have in the price itself.  If the specified value of a depreciable component is overvalued, the seller must suffer recovery of depreciation allowances by the Medicare program.  If the asset is undervalued, the buyer has a lower historical cost basis and will receive a diminished level of depreciation from Medicare.

The sale of *Vallejo* occurred in February 1979 and the decision of the court was rendered in June 1988, both before the 1991 effective date of the capital costs PPS. [Doc. No. 52, p. 10].

15

After the change, according to the intermediary's argument to the PRRB, a buyer could "low ball" the values to depreciable assets in the allocation agreement with negligible Medicare impact to the buyer. [*Id.,* AR at 1070-1071]. The intermediary argued that "[t]he capital reimbursement landscape has changed" and asserted this factor, among others gave it "the authority under the regulation, to accept part of the allocation agreement (the land, property assets" and reject another part (the so-called intangibles)." [*Id.,* AR at 1071].

The shift in the agency's interpretation can be seen in the PRRB decision in *Dakota Midland Hospital v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of Iowa,* 1997 WL 383652 (P.R.R.B.). In *Dakota Midland,* the intermediary argued no portion of the purchase price should be allocated to MR and AWF, because the provider failed to recover even the appraised fair market value of the tangible assets and the sales agreement was silent with respect to allocation of the sales price to the assets sold. The PRRB stated:

> The Intermediary points out that when a buyer pays more for a group of assets used to operate a business as a going concern than the appraised fair market value of the assets, that evidences a market determination that a business is worth more than the sum of its pieces. The operations of the Provider did not build up good will. The buyer paid less than the fair market value of the property, plant and equipment. When a business sells for more than the value of its tangible assets, it might be appropriate to look into the excess and see if it is general goodwill or can be pinned down to specific aspects of the business. When a business does not sell for more than the value assets, the search for intangibles is unnecessary.

1997 WL 383652, at *5. The PRRB agreed with the intermediary, concluding:

> The Board is not persuaded by the Provider's arguments that there were intangible assets, even in light of the Provider's independent appraisal, which attached a value to intangible assets. These intangible assets are not the basis of any offset, and the Board does not recognize any of the intangible assets. The transferring of patient records and maintaining the work force were part of the sellers [*sic*] obligations or conditions necessary for the sale to close. They are not quantifiable as assets.

16

*Id.* at *7.

In *Lake Medical Center v. Thompson,* 243 F.3d 568 (C.A.D.C. 2001) (upholding the decision of the district court in *Lake Medical Center v. Shalala,* 89 F.Supp.2d 83 (D.D.C. 2000)), the appellate court sided with the intermediary on the issue of whether sales proceeds can be allocated to intangible assets.  There, a lump sum sale of hospital assets took place, and the sales price was lower than the fair market value of the depreciable assets.  243 F.3d at 569. The sales agreement made no allocation of the sales price among the assets.  *Id.* at 571.  The provider sought to allocate a portion of sales proceeds to medical records.  The PRRB, however, assigned no value to the medical records.  The district court affirmed the PRRB ruling and the appellate court agreed, stating:

> It is true that the appraiser placed a fair market value of $1.5 million on the medical records out of a total appraisal of approximately $17 million for the center, although everything actually sold for $14.4 million.  But those numbers show that the purchaser paid nothing for residual going concern value: the tangible assets were sold for less than their fair market value.  Medical records are, the Board determined, akin to goodwill, assigned a positive value only when the sales price of the other assets exceeds their fair market value.

*Id.*  The court noted that the PRRB's judgment comported with generally accepted accounting practices, and found the PRRB sufficiently supported its conclusion that the medical records "could not...be valued as an asset independent of Lake Medical's ongoing operations."  *Id.* (internal quotations and citations omitted).

The PRRB Decision in this case closely mirrored the reasoning in *Dakota Midland* and *Lake Medical Center.*  The PRRB  stated:

> MR and AWF are intangible assets that have going concern value and only exist in sales transactions where the sale proceeds exceed the value of the land and other tangible assets involved in the purchase.  As noted above, the sales proceeds

did not exceed the value of the tangible assets in the instant case; therefore MR
and AWF are not found to exist.

[Doc. No. 30, PRRB Decision, AR at 13].  The PRRB also cited, in support of its decision,  the

definition of "intangible value" published in *A Dictionary for Accountants* and on Paragraph 39

of FASB 141.[10]

The court, however, finds *Dakota Midland* and *Lake Medical Center* are distinguishable

from this fact situation in one important respect:  neither of those cases involved sales

agreements that specifically provided for allocation of sales proceeds to the intangible assets at

issue.  In *Lake Medical Center,* the district court pointed out that although the sales agreement

list MR among the "assets sold," it did not assign a value.  The court commented:

> The mere mention of the medical records as "assets" establishes only that the
> records were intended to be among the assets transferred in the sale, not that
> they specifically were sold for independent value.
>
> \*       \*       \*
>
> [T]here is no evidence the buyer associated any acquisition cost with the medical
> records specifically.  Although the Board has previously found that an agreement
> between a buyer and seller regarding allocation of the purchase price to medical
> records is controlling in the loss/gain calculation, it is undisputed that there is
> no such agreement in this case.

89 F.Supp.2d at 91.  Similarly, in *Dakota Midland,* the PRRB, noting the Consolidation

Agreement was silent with respect to the sales price of assets sold, agreed with the

intermediary's argument that "a review of what is in the <u>Consolidation Agreement</u> belies the

existence of the intangible assets at issue."  1997 WL 383652, at \*2, \*5.

In this case, in contrast, the Agreement explicitly allocated portions of the sales price to

_____

[10]OFF points out that Paragraph 39 of FASB 141 was not promulgated until 2001–more
than two decades after the CMS Rule was adopted in 1979.

MR and AWF *and* an independent appraisal established fair market values and corresponding allocations of net sales proceeds to these intangible assets.

Moreover, the court is mindful of the Tenth Circuit's admonition that it cannot "torture the language" of the regulation "to reach a result that the agency wishes." *Via Christi,* 509 F.3d at 1273.   Instead the court's review must focus on whether the Secretary's interpretation of Medicare reimbursement regulations runs afoul of the plain meaning of the regulations or does not comport with the Secretary's intent at the time the regulations were promulgated.   *Via Christi,* 509 F.2d at 1272.   In that case, the court stated:

> We must defer to the Secretary's interpretation *unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation*.

*Id.*, quoting *Thomas Jefferson Univ.,* 512 U.S. at 512.

In *Via Christi,* the provider claimed it was entitled to reimbursement for Medicare depreciation expenses after it incurred a $9.7 million "loss" on assets it had acquired as the surviving entity in a consolidation between two medical centers.   *Id.* at 1261.   The Secretary and the district court had denied the claim on two grounds: first, the consolidation was between "related parties" under 42 C.F.R. §§413.134 and 413.17, and second, no "bona fide sale" occurred under 42 C.F.R. §413.134(f).   The court concluded the Secretary's "related party" interpretation contradicted the plain language of §413.134(f) but affirmed denial of reimbursement based on the "bona fide sale" requirement.

In addressing the "related party" issue, the court held that the plain language of §§413.134 and .17 focused solely on whether the parties to the consolidation were related prior to the transaction and not on whether they were related to the newly created entity.   The court

19

concluded:

> Where the plain language of a regulation is clear, we cannot torture the language to reach the result the agency wishes.  The agency, after all, could easily have drafted language to achieve the result which it now advocates but did not do so. If the Secretary wants to take a position that is inconsistent with existing regulations, then the Secretary must promulgate new regulations under the notice-and-comment provisions of the APA, 5 U.S.C. §553.

*Id.* at 1273 (internal quotations and citations omitted). The court found, moreover, that the plain language of the regulation comported with the Secretary's intent at the time of the section's promulgation.  *Id.*

The court in *Via Christi* acknowledged the district court had reached the opposite conclusion, as had the Eastern District of Pennsylvania–the only other district court to consider the issue.  *Id.*  It stated,  "Like the PRRB, however, we refuse torture the language to reach the result the agency wishes."  *Id.*

This case is analagous to *Via Christi.*  The plain language of the CMS Rule allows the parties, pursuant to a sales agreement, to allocate a lump sum sales price among "*all* the assets sold"–not just tangible assets.  42 C.F.R. §413.134(f)(2)(iv).  It provides that in the event an independent appraisal establishing fair market value of assets is obtained, the intermediary "*will* make an allocation of the sales price in accordance with the appraisal." *Id.*  The history of the statute and regulation also support the conclusion that, at the time the CMS Rule was promulgated, the Secretary did not intend to distinguish between tangible and intangible assets. The Secretary's efforts to exclude tangible assets commenced after the change of the statute to allow reimbursement for capital-related costs effective October 1, 1991.

The Secretary's rationale for declining to allocate a portion of net sales proceeds to MR

and AWF  is imminently reasonable.  However, it is inconsistent with the existing CMS Rule and requires promulgation of a revised regulation under the notice and comment provisions of the APA, 5 U.S.C. §553.  *See Via Christi* at 1273.

The court concludes the decision by the Secretary was arbitrary and capricious in that it was inconsistent with plain meaning of the CMS Rule and with the intent expressed at the time the regulation was promulgated.   The decision is hereby reversed and remanded for further consideration consistent with this ruling.

ENTERED this 26th day of July, 2010.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

21